FILED

2025 Mar-17  AM 09:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **TERRI MINOR,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 6:24-cv-00058-MHH** |
| | } | |
| **LELAND DUDEK, ACTING** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,** [1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Terri Denise Minor has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. Minor's claims for a period of disability and disability insurance benefits based on the Administrative Law Judge's finding that Ms. Minor was not disabled.  Ms. Minor challenges the finding.  This opinion resolves her appeal.

---

[1] On February 17, 2025, Leland Dudek became the Acting Commissioner of the Social Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner Dudek as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time. . . .").

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Minor had to prove she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Jan. 27, 2025).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."  *Wright*, 327 Fed. Appx. at 137.

Ms. Minor applied for a period of disability and disability insurance benefits on April 14, 2021.  (Doc. 7-4, pp. 93-97).  Ms. Minor alleged that her disability began on April 11, 2021.  (Doc. 7-4, p. 94).  The Social Security Commissioner initially denied Ms. Minor's claims, and Ms. Minor requested a hearing before an Administrative Law Judge.  (Doc. 7-3, pp. 129-147; Doc. 7-4, pp. 16-17).  Ms. Minor and her attorney attended a telephone hearing with an ALJ on April 25, 2023.  (Doc. 7-3, pp. 110-128).  A vocational expert testified at the hearing.  (Doc. 7-3, pp. 123-128).

The ALJ issued an unfavorable decision on May 31, 2023.  (Doc. 7-3, pp. 11-23).  On November 22, 2023, the Appeals Council declined Ms. Minor's request for review, (Doc. 7-3, p. 1), making the Commissioner's decision final and thus a proper candidate for this Court's judicial review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Minor's Medical Records*

To support her application, Ms. Minor relied on medical records relating to the treatment and diagnoses of type 2 diabetes, diabetic autonomic neuropathy, urge fecal incontinence, chronic diarrhea, gastroparesis, cataracts, a detached retina in her left eye, and obesity.[3]  The Court has reviewed Ms. Minor's complete medical history and summarizes the following medical records because they are most relevant to the Court's decision in this appeal.

On January 6, 2020, Ms. Minor saw Dr. Steve Johnson and reported that she worked at Wal-Mart, had not been "evaluated in three years," and wanted to "establish [a] new primary care physician." (Doc. 7-6, p. 79).  Ms. Minor's medical history included type 2 diabetes, obesity, hyperandrogenism, chronic left lower quadrant abdominal wall abscess, and depression. (Doc. 7-6, p. 79).[4]  Ms. Minor

---

[3]  "Autonomic neuropathy occurs when there is damage to the nerves that control automatic body functions."  Autonomic neuropathy can affect digestion and cause "loss of appetite, diarrhea, constipation, abdominal bloating, nausea, vomiting, difficulty swallowing and heartburn."  *See* https://www.mayoclinic.org/diseases-conditions/autonomic-neuropathy/symptoms-causes/syc-20369829 (last visited Jan. 27, 2025).

"Gastroparesis is a condition in which the muscles in the stomach don't move food as they should for it to be digested. . . . .  Gastroparesis affects digestion. It can cause nausea, vomiting and belly pain. It also can cause problems with blood sugar levels and nutrition. There's no cure for gastroparesis.  But medicines and changes to diet can give some relief."  *See* https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited Jan. 27, 2025).

[4]  "Hyperandrogenism is defined as the condition characterized by clinical signs of androgen excess, such as acne, hirsutism, or androgenic alopecia, or by the presence of elevated levels of

4

weighed 210 pounds.  (Doc. 7-6, p. 79).  Dr. Johnson noted that Ms. Minor had poor control of her diabetes.  (Doc. 7-6, p. 79).  Dr. Johnson indicated that Ms. Minor had had "extensive left lower quadrant abdominal wall debridement" surgery three years earlier and that the abdominal wall abscess had "never completely closed in."  (Doc. 7-6, p. 79).  Dr. Johnson prescribed an antibiotic for the abdominal wall abscess, referred Ms. Minor to the wound center, and indicated that Ms. Minor needed better control of her diabetes.  (Doc. 7-6, p. 79).  On January 20, 2020, Dr. Johnson noted that Ms. Minor had poor control of her diabetes because she "simply [did] not take her insulin."  (Doc. 7-6, p. 89).

At an April 13, 2020 visit, Ms. Minor weighed 217 pounds.  (Doc. 7-5, pp. 81-82).  Her medications included Lasix, Lexapro, BuSpar, Lotrel, Novolin, and metformin.  (Doc. 7-5, p. 81).[5]  Ms. Minor denied having abdominal pain, diarrhea,

---

circulating          androgens          in          the          body."          *See* https://www.sciencedirect.com/topics/neuroscience/hyperandrogenism (last visited Jan. 29, 2025).

[5] Lasix is a diuretic used to reduce fluid retention caused by congestive heart failure, liver disease, and kidney disease.  *See* https://www.webmd.com/drugs/2/drug-5512-8043/furosemide-oral/furosemide-oral/details (last visited Jan. 27, 2025).

Lexapro and BuSpar are used to treat anxiety and depression.  *See* https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last visited Jan. 27, 2025); https://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Jan. 27, 2025).

Lotral treats high blood pressure.  *See* https://www.webmd.com/drugs/2/drug-11524/amlodipine-benazepril-oral/details (last visited Jan. 27, 2025).

Novolin and metformin are used to treat diabetes.  *See* https://www.webmd.com/drugs/2/drug-1468/novolin-70-30-u-100-insulin-subcutaneous/details (last visited Jan. 27, 2025);

nausea, vomiting, anxiety, depression, and fatigue. (Doc. 7-5, pp. 81-82). Dr. Johnson noted that Ms. Minor's "abdominal wall lesions [had] healed with scarring," that she had poor diet compliance and diabetic control, that her blood sugars ran high, and that she had "stable mood and thinking." (Doc. 7-5, p. 82). Dr. Johnson's impression included borderline hypertension, hyperandrogenism, and poorly controlled type 2 diabetes. (Doc. 7-5, p. 82). Dr. Johnson noted that Ms. Minor was a "[g]ood candidate for Rybelsus" to control her diabetes. (Doc. 7-5, p. 82).

At a May 19, 2020 visit with Dr. Johnson, Ms. Minor reported that she had "some issues with constipation." (Doc. 7-5, p. 85). Dr. Johnson noted that Ms. Minor had poorly-controlled type 2 diabetes with no hypoglycemia; a "[l]arge[,] soft protuberant abdomen;" and slight swelling in her ankles. (Doc. 7-5, p. 85). On August 11, 2020, Ms. Minor reported that she did not diet, did not check her blood sugars, and could not take Rybelsus because of nausea. (Doc. 7-5, p. 88). Dr. Johnson noted that Ms. Minor did not have swelling in her ankles but had "poor diabetic control" related to "poor compliance with diet and exercise and medications." (Doc. 7-5, p. 88). Dr. Johnson indicated that he and Ms. Minor talked about medication compliance at her appointments, but Ms. Minor "never follow[ed] through." (Doc. 7-5, p. 88). Dr. Johnson recommended a low carbohydrate diet and

---

https://www.mayoclinic.org/drugs-supplements/metformin-oral-route/description/drg-20067074 (last visited Jan. 27, 2025).

brisk walking "to 30 minutes daily," and he added a prescription for Actos. (Doc. 7-5, pp. 88-89).[6]

On August 4, 2020, Ms. Minor saw Dr. Taylor Mosley at The Eye Center of Alabama for an evaluation for cataracts in both eyes. (Doc. 7-5, pp. 43-47). Ms. Minor reported that her eyes were "very light sensitive," that "glare bother[ed] her," and that her symptoms significantly impacted her daily life. (Doc. 7-5, p. 43). Ms. Minor denied having lack of energy, nausea, vomiting, diarrhea, and weakness. (Doc. 7-5, p. 43). Dr. Mosley noted Ms. Minor's history of type 2 diabetes, high blood pressure, arthritis, and anxiety. (Doc. 7-5, p. 43). Dr. Mosley's diagnosis included age-related nuclear cataracts and type 2 diabetes with "moderate nonproliferative diabetic retinopathy without macular edema" in both eyes. (Doc. 7-5, p. 46). On September 1, 2020, Dr. Mosley performed outpatient cataract surgery on Ms. Minor's left eye. (Doc. 7-5, pp. 48, 59-75). Dr. Mosley prescribed Besivance, Ilevro, and Durezol and restricted activity for one week. (Doc. 7-5, p. 49).[7] Ms. Minor was "doing well" at a September 8, 2020 visit; Dr. Mosley stopped Besivance, decreased Durezol to daily, and continued Ilevro daily. (Doc. 7-5, p. 51).

---

[6] "Actos is an oral diabetes medicine that helps control blood sugar levels. Actos is used together with diet and exercise to improve blood sugar control in adults with type 2 diabetes mellitus." *See* https://www.drugs.com/actos.html (last visited Jan. 27, 2025).

[7] "Besivance is an antibiotic eye drop used to treat certain bacterial infections of the eye." *See* https://www.webmd.com/drugs/2/drug-152455/besivance-ophthalmic-eye/details (last visited Jan. 27, 2025). Ilevro is an eye drop used to treat "eye pain and inflammation from cataract surgery." *See* https://www.webmd.com/drugs/2/drug-163094/ilevro-ophthalmic-eye/details (last

At an October 1, 2020 visit with Dr. Johnson, Ms. Minor reported stomach cramps, nausea, vomiting, and constipation. (Doc. 7-5, p. 92).[8] Dr. Johnson noted that Ms. Minor had "poor diabetic control" and continued 30 mg Actos daily. (Doc. 7-5, p. 92). On November 13, 2020, Ms. Minor reported that she had to leave work because of nausea, vomiting, and fatigue. (Doc. 7-5, p. 96).[9] Dr. Johnson noted Ms. Minor's continued poor compliance with diet, exercise, and diabetic medications. (Doc. 7-5, p. 96). He prescribed ondansetron for nausea. (Doc. 7-5, p. 97).[10] On December 15, 2020, Dr. Johnson indicated that Ms. Minor had a recurrent issue with "postprandial vomiting without nausea," but her bowel movements were normal. (Doc. 7-5, p. 99). She weighed 212 pounds, and her blood pressure was 169/75. (Doc. 7-5, p. 98). Dr. Johnson added a prescription for Benicar to control her blood

---

visited Jan. 27, 2025). Durezol is an eye drop used to treat swelling and pain after eye surgery. *See* https://www.webmd.com/drugs/2/drug-151208/durezol-ophthalmic-eye/details (last visited Jan. 27, 2025).

[8] In the "Review of Systems" section under "Gastrointestinal," Dr. Johnson noted that Ms. Minor denied abdominal pain, constipation, diarrhea, nausea, and vomiting at that visit. (Doc. 7-5, p. 91). But in the "Physical Examination" section under "Physician Summary," Dr. Johnson noted that Ms. Minor complained of abdominal cramps, nausea, vomiting, and constipation at that visit. (Doc. 7-5, p. 92). Because the systems review sections were similar for each visit and contradicted Ms. Minor's reports to Dr. Johnson under the physician summary section, the Court focuses on Ms. Minor's reports to Dr. Johnson noted in the physician summary section for each visit.

[9] Dr. Johnson tested Ms. Minor for COVID-19; her test was negative. (Doc. 7-5, pp. 96, 122).

[10] "Ondansetron is used to prevent nausea and vomiting. . . . Ondansetron works in the stomach to block the signals to the brain that cause nausea and vomiting." *See* https://www.mayoclinic.org/drugs-supplements/ondansetron-oral-route-oromucosal-route/description/drg-20074421 (last visited Feb. 6, 2025).

pressure and metoclopramide for possible "diabetic gastroparesis."  (Doc. 7-5, pp. 99-100).  He again recommended brisk walking "to 30 minutes daily."  (Doc. 7-5, p. 100).[11]

On February 8, 2021, Ms. Minor saw Dr. Johnson and complained of "stomach issues" and "persistent nausea."  (Doc. 7-5, pp. 102-103).  Ms. Minor had stopped taking metoclopramide because it caused diarrhea.  (Doc. 7-5, p. 103).  Dr. Johnson noted that Ms. Minor had a history of "diabetic autonomic neuropathy causing gastric stasis, intestinal bacterial overgrowth, [and] chronic diarrhea."  (Doc. 7-5, p. 103).  Ms. Minor stated that she was having "frequent, sudden, sometimes explosive diarrhea prompting urgent trips to the bathroom," but she did not have abdominal pain or vomiting.  (Doc. 7-5, p. 103).  Ms. Minor stated that she was stressed at work.  (Doc. 7-5, p. 103).  She reported that when she "work[ed] on the floor" at Wal-Mart, she could "make urgent bathroom trips adequately," but she had a "great deal of stress and anxiety" when she was "tied to a cash register" because she might not make it to the bathroom in time.  (Doc. 7-5, p. 104).  Ms. Minor had poor sleep because of worry, high blood sugar levels, and decreased light touch in her legs and feet.  (Doc. 7-5, p. 104).

---

[11]    Benicar "is used alone or together with other medicines to treat high blood pressure (hypertension)."  *See*  https://www.mayoclinic.org/drugs-supplements/olmesartan-oral-route/description/drg-20065169 (last visited Feb. 6, 2025).

Dr. Johnson noted that Ms. Minor had poor diabetic control, that she struggled to follow a diet and exercise program because she lacked self-discipline, and that her diabetic medications were expensive.  (Doc. 7-5, p. 103).  Dr. Johnson wrote that Ms. Minor's chronic diarrhea might be a "combination of irritable bowel syndrome" and "diabetic autonomic neuropathy with small bowel bacteria overgrowth."  (Doc. 7-5, p. 104).  He prescribed Flagyl and a probiotic for Ms. Minor's chronic diarrhea and noted that he would add Questran if she did not improve after two weeks.  (Doc. 7-5, p. 104).[12]  Dr. Johnson indicated that he would write a letter to Ms. Minor's employer at Wal-Mart "requesting that she not be placed on [the] cash register because of the unpredictable [and] often explosive bowel urgency."  (Doc. 7-5, p. 104).

At a visit with Dr. Johnson on March 9, 2021, Ms. Minor indicated that Wal-Mart made "some limited accommodations" after receiving Dr. Johnson's letter, but Wal-Mart had not removed her "totally from cash register obligations."  (Doc. 7-5, p. 107).  Ms. Minor reported that she stopped taking Flagyl "because of the yeast" but took Imodium for diarrhea.  (Doc. 7-5, p. 107).  Dr. Johnson noted that Ms. Minor could not tolerate Flagyl for her diarrhea and was "between a rock and a hard

---

[12]  Flagyl "is used to treat bacterial infections in different areas of the body.  It is also used to treat infections caused by protozoa . . . and infections caused by bacteria that do not need oxygen to survive."  *See*  https://www.mayoclinic.org/drugs-supplements/metronidazole-oral-route/description/drg-20064745 (last visited Feb. 6, 2025).  Questran "is used 'off-label] for the treatment of bile acid diarrhea."  *See* https://www.verywellhealth.com/cholestyramine-overview-1944663 (last visited Feb. 6, 2025).

place about continuing to work" without better accommodations for her chronic diarrhea. (Doc. 75, p. 108). Ms. Minor indicated that she did not check her blood sugar levels and did not take her insulin medications on a regular basis; Dr. Johnson noted "poor diabetic control." (Doc. 7-5, p. 107). Dr. Johnson referred Ms. Minor to a gastroenterologist. (Doc. 7-5, p. 108).

Ms. Minor saw Dr. Angela Prince on March 11, 2021 for an annual eye exam. (Doc. 7-5, pp. 77-79). Ms. Minor reported that her left eye was "still not what it should be" after her cataract surgery in 2020. (Doc. 7-5, p. 77). Ms. Minor's medications included metformin and Novolin for her diabetes, Lotrel for high blood pressure, and Lexapro for anxiety and depression. (Doc. 7-5, p. 78).

At an April 12, 2021 visit with Dr. Johnson, Ms. Minor reported that she was "very stressed" because her managers at Wal-Mart "put pressure on her" and that she vomited in her mask at work, soiled her clothes because she could not make it to the bathroom while working, and had to buy new clothes during her shift. (Doc. 7-5, pp. 111-112). Dr. Johnson noted that Ms. Minor "[d]id not have a meaningful response to Flagyl and probiotics," was not taking Questran regularly, and used Imodium as needed. (Doc. 7-5, p. 112). Dr. Johnson "advised [Ms. Minor] to apply for social security disability if she [could not] continue to work" and noted that Ms. Minor did not have "many options" and did not have a "good social support structure." (Doc. 7-5, p. 112). On May 7, 2021, Ms. Minor reported "urgent

abdominal cramps and explosive diarrhea" and urge fecal incontinence. (Doc. 7-6, p. 135). Ms. Minor stated that she had been off work since April 12, 2021 and could not return to work despite "some limited accommodations by Wal-Mart" because of her "severe anxiety" and embarrassment about her "fecal incontinence." (Doc. 7-6, p. 135). Dr. Johnson indicated that Ms. Minor had a stable mood and thoughts and seemed "upbeat and positive" at the visit. (Doc. 7-6, p. 136). Dr. Johnson noted that Ms. Minor had poor control of her diabetes because she did not check her blood sugar levels and did not eat a proper diet. (Doc. 7-6, p. 135). At a November 4, 2021 visit with Dr. Johnson, Ms. Minor reported continued issues with explosive diarrhea and fecal incontinence. (Doc. 7-6, p. 155). She weighed 204 pounds and had lost four pounds since the preceding visit, but she had poor control of her diabetes with fluctuating blood sugar levels. (Doc. 7-6, p. 155).

At an April 6, 2022 visit with Dr. Johnson, Ms. Minor reported that she had "chronic diarrhea with sudden bowel urge incontinence," had to stay "close to the bathroom," often wore pull ups, and often soiled herself. (Doc. 7-6, p. 254). She stated that she lived off her savings and worried her money would run out. (Doc. 7-6, p. 254). Ms. Minor reported that she slept more than eight hours a night but woke up fatigued, had difficulty dieting, could not exercise, had recurrent skin infections, and had fluctuating blood sugar levels. (Doc. 7-6, p. 254). Ms. Minor had decreased sensation in her legs and feet, poorly controlled diabetes, and anxiety and depression

related to her health and finances.  (Doc. 7-6, pp. 254-255).  Dr. Johnson indicated that Ms. Minor's "excess daytime sleepiness" was most likely undiagnosed and untreated obstructive sleep apnea, but Ms. Minor could not afford a sleep evaluation. (Doc. 7-6, p. 255).  Dr. Johnson noted that Ms. Minor was an "[e]xcellent candidate for Ozempic."  (Doc. 7-6, pp. 244, 245).  He indicated that he would "try to get [Ms. Minor] indigent coverage" because she could not afford Ozempic or a sleep study. (Doc. 7-6, pp. 254, 255).  For her obesity, Dr. Johnson continued to encourage Ms. Minor to eat a low carbohydrate diet and walk "to 30 minutes daily."  (Doc. 7-6, p. 255).

On June 13, 2022, Ms. Minor told Dr. Johnson that her health had been poor for months.  (Doc. 7-6, p. 273).  Ms. Minor reported abdominal pain and cramps; recurring diarrhea; rectal incontinence; and neuropathy in her hands, legs, and feet. (Doc. 7-6, p. 273).  Ms. Minor indicated that she had to "[c]ut her insulin back to 1 dose of Novolin . . . daily because of finances" and that she did not check her blood sugar levels.  (Doc. 7-6, p. 273).  Dr. Johnson noted that Ms. Minor's chronic diarrhea "impact[ed] her quality of life and daily function" and prevented her from "working any public job" and that Ms. Minor "lost her job at Wal-Mart because of [her] diabetic complication."  (Doc. 7-6, p. 274).  At a December 13, 2022 visit, Ms. Minor indicated that she had a "minor abdominal wall infection" that she treated at home in August 2022.  (Doc. 7-6, p. 277).  Dr. Johnson noted decreased sensation

in Ms. Minor's ankles and feet but an otherwise normal neurological examination. (Doc. 7-6, p. 277).  Dr. Johnson again indicated that he would "[t]ry to get approval for Ozempic."  (Doc. 7-6, p. 278).  Ms. Minor's blood pressure was 173/81, and Dr. Johnson added carvedilol for hypertension.  (Doc. 7-6, pp. 276, 277).

On January 24, 2023, Dr. Johnson noted that Ms. Minor "[w]as intolerant of GLP-1 agonist."  (Doc. 7-6, p. 281).[13]  Ms. Minor had gained 10 pounds and did not diet or exercise.  (Doc. 7-6, p. 281).  Mr. Minor had chronic leg and ankle swelling and blood sugars in the "200-300 range" because she not "adjust her Novolin." (Doc. 7-6, p. 281).  Dr. Johnson noted that Ms. Minor declined blood work for her diabetes because she was not insured.  (Doc. 7-6, p. 281).  Her blood pressure was 180/80, and Dr. Johnson increased carvedilol and added a prescription for Lasix. (Doc. 7-6, pp. 280, 281).

On March 31, 2023, Ms. Minor saw Dr. Andrea Sims at Jasper Eyecare Center and complained of "[s]eeing floaters in her left eye."  (Doc. 7-6, p. 284).  Dr. Sims noted Ms. Minor's medical history of type 2 diabetes "w/o compl. controlled," diabetic autonomic neuropathy, and hypertension.  (Doc. 7-6, p. 284).  Dr. Sims wrote that Ms. Minor had a total retinal detachment in her left eye.  (Doc. 7-6, p.

---

[13]  Ozempic is a GLP-1 agonists for type 2 diabetes generally taken by an injection.  *See* https://www.mayoclinic.org/diseases-conditions/type-2-diabetes/expert-answers/byetta/faq-20057955 (last visited Jan. 27, 2025).  Although Dr. Johnson's medical notes for this visit are unclear, it appears he obtained indigent assistance for Ms. Minor for at least a trial of a GLP-1 agonist.

286). Dr. Sims noted that she would send a letter to Ms. Minor's disability attorney and inform Dr. Johnson of the results of the exam. (Doc. 7-6, p. 286).

### CRNP Lindsey Smith's Consultative Physical Examination

On February 28, 2022, at the request of the Disability Determination Service, CRNP Smith at the Sumiton After Hours Clinic reviewed Ms. Minor's medical records and examined her. (Doc. 7-6, pp. 174, 176, 179). Ms. Minor reported that she stopped working at Wal-Mart because her diarrhea and vomiting became "so debilitating she was afraid she would get fired for missing work." (Doc. 7-6, p. 177). She complained of daily diarrhea, fecal incontinence, abdominal pain not associated with meals or time of day, vomiting three or four times a week, and intermittent knee pain that was worse when she squatted, stooped, bent, or stood for an extended period of time. (Doc. 7-6, p. 177). Ms. Minor stated that she took Flagyl "several times" and took Imodium as needed. (Doc. 7-6, p. 177). She reported that Lexapro and BuSpar controlled her anxiety and depression symptoms; that she could perform her "personal ADLs independently"; and that she prepared meals, did housework, drove, and ran errands. (Doc. 7-6, p. 177).

CRNP Smith noted that Ms. Minor walked without an assistive device and got on and off the examination table without assistance. (Doc. 7-6, pp. 176-177). On physical examination, Ms. Minor had full vision fields, intact color vision, and corrected visual acuity with glasses; a slightly distended abdomen and lower

abdominal tenderness; slight swelling, tenderness, and pain with range of motion in her right knee; and an antalgic gait on the left side. (Doc. 7-6, pp. 177-179). Ms. Minor could not "walk on [her] toes or heels secondary to loss of balance" and could not "squat or kneel secondary to pain." (Doc. 7-6, pp. 178-179). She did not have joint pain, muscle atrophy, or loss of sensation or swelling in her lower legs and had 5/5 muscle strength in all areas. (Doc. 7-6, pp. 178-179). An x-ray of Ms. Minor's right knee showed "mild degenerative disease" in the medial compartment. (Doc. 7-6, pp. 175, 179).

CRNP Smith opined that Ms. Minor could not frequently stoop, bend, or squat "secondary to her intermittent knee pain" likely attributed to arthritis and that her condition was unlikely to improve. (Doc. 7-6, p. 179). CRNP Smith assessed that Ms. Minor had "limitations sitting, ambulating short distances, [and] going from sitting to standing." (Doc. 7-6, p. 180). CRNP Smith concluded that Ms. Minor's "[l]imitations regarding frequent diarrhea [and] fecal incontinence would likely interfere with attendance at work if [her] employer [was] unable to accommodate or if [her condition] continue[d] to worsen." (Doc. 7-6, p. 180).

### Dr. Gloria Sellman's Administrative Physical Residual Functional Capacity Assessment

On October 5, 2022, at the request of the Social Security Administration, Dr. Sellman reviewed Ms. Minor's medical records and assessed her residual functional capacity. (Doc. 7-3, pp. 145-47). Dr. Sellman opined that Ms. Minor occasionally

could lift and carry 50 pounds and frequently lift and carry 25 pounds; could stand and/or walk and sit with normal breaks six hours in an eight-hour workday; frequently could climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and should avoid extreme cold and hot and unprotected heights. (Doc. 7-3, pp. 145-146). Dr. Sellman noted that an x-ray of Ms. Minor's knee showed mild degenerative changes and that Ms. Minor had normal range of motion in her knees and 5/5 muscle strength in both legs. (Doc. 7-3, p. 146). Dr. Sellman indicated that Ms. Minor's treating physician "attribute[d] chronic diarrhea to poor compliance with diet, exercise, and medications." (Doc. 7-3, p. 146). Based on her assessment, Dr. Sellerman opined that Ms. Minor could perform work at the medium exertional level. (Doc. 7-3, p. 147).

### *Dr. Dorn Majure's Consultative Mental Examination*

On November 22, 2021, at the request of the Social Security Administration, licensed psychologist Dr. Majure reviewed Dr. Johnson's April and May 2021 medical notes and examined Ms. Minor. (Doc. 7-6, p. 171). Dr. Majure noted Ms. Minor's medical history of type 2 diabetes, autonomic neuropathy, and hypertension. (Doc. 7-6, p. 171). Ms. Minor reported that she had suffered from depression since she was a teenager; her depression symptoms included inability to

"get anything done, excessive sleeping, and not wanting to go anywhere." (Doc. 7-6, p. 173). Ms. Minor rated her depression at 6/10 at the visit. (Doc. 7-6, p. 173).[14]

Dr. Majure found that Ms. Minor had average intellectual functioning and "adequate insight into her current situation." (Doc. 7-6, p. 173). Dr. Majure opined that Ms. Minor had no impairment "in her ability to understand, remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting." (Doc. 7-6, p. 173). Dr. Majure noted that Ms. Minor's prognosis was "fair with appropriate treatment." (Doc. 7-6, p. 173).

### Ms. Minor's Function Report

On April 13, 2021, at the request of the Social Security Administration, Ms. Minor completed an adult function report. (Doc. 7-4, pp. 106-113). Ms. Minor stated that she lived alone. (Doc. 7-4, p. 106). Ms. Minor indicated that on a typical day she got dressed, drank coffee, watched television, checked the mail, took medications, napped, ate dinner, took evening medications, washed clothes, tried to clean, watched television, and went to bed. (Doc. 7-4, p. 107). She did not take care of pets, had no problems with personal care, prepared simple meals, cleaned her house a "little daily," did laundry once a week, and picked up sticks around her yard

---

[14] Dr. Majure's notes do not indicate that Ms. Minor discussed her fecal incontinence, explosive diarrhea, or anxiety about soiling herself at work. Dr. Johnson's April and May 2021 medical notes to which Dr. Majure had access included Ms. Minor's reports regarding her anxiety about her fecal incontinence and chronic diarrhea.

after heavy rains or storms.  (Doc. 7-4, pp. 107-108).  Ms. Minor stated that she drove, shopped in stores every one to two weeks for less than an hour, paid bills, and handled a savings and checking account.  (Doc. 7-4, p. 109).  Ms. Minor indicated that she had enjoyed shopping and eating lunch with her sister and niece but did not go anywhere on a regular basis after she stopped working in April 2021.  (Doc. 7-4, p. 110).

Ms. Minor indicated that excessive nausea, vomiting, diarrhea, fatigue, anxiety, and depression limited her ability to work.  (Doc. 7-4, p. 106).  She stated that arthritis in her right knee affected her ability to squat, kneel, and climb stairs, and her cataracts and astigmatism affected her sight.  (Doc. 7-4, p. 111).  Ms. Minor could walk 15 to 20 minutes before she needed to stop and rest, followed written instructions "very well," did not handle stress as well as she had previously, and had fear and anxiety about "not finding or getting to a bathroom."  (Doc. 7-4, pp. 111-112).

Ms. Minor completed a second function report on August 29, 2022.  (Doc. 7-4, pp. 144-150; Doc. 7-5, p. 1).  Ms. Minor stated that she rarely left her house and could not "stay away from home very long" because of "anxiety over fear of not getting to a bathroom in time."  (Doc. 7-4, pp. 144-145, 150).  She had no desire to go outside.  (Doc. 7-4, p. 147). She used a pill organizer because she would forget to take her medications.  (Doc. 7-4, p. 146).  Her niece helped with housework

because of Ms. Minor's fatigue.  Ms. Minor indicated that she could lift 20 to 25 pounds; could not squat, kneel, or climb stairs; had blurry vision in her left eye after cataract surgery; and had trouble concentrating and completing tasks because of fatigue and "overall lack of wellbeing."  (Doc. 7-4, p. 149).

### Ms. Minor's Sister's Third-Party Function Report

On September 20, 2021, Karon Freeman, Ms. Minor's sister, completed an adult third-party function report.  (Doc. 7-4, pp. 126-133).  Ms. Freeman reported that Ms. Minor had the limitations included in Ms. Minor's function report.  Ms. Freeman indicated that Ms. Minor cared for her cats by feeding them.  (Doc. 7-4, p. 127).  Ms. Freeman stated that Ms. Minor did not need help cleaning, doing laundry, washing dishes, sweeping, or mopping.  (Doc. 7-4, p. 128).  Ms. Freeman indicated that Ms. Minor did not get out much because of fear of not being close to a bathroom and soiling her clothing, and she was "stressed out around unfamiliar people" and crowds.  (Doc. 7-4, pp. 129, 130, 131, 132).  Ms. Freeman explained that Ms. Minor's fear of soiling her clothing caused "high anxiety," isolation, and depression.  (Doc. 7-4, p. 133).

### Administrative Hearing

Ms. Minor attended a telephone administrative hearing with an ALJ on April 25, 2023.  (Doc. 7-3, pp. 112-113).  Ms. Minor testified that she was 59 years old, had a high school education, and attended classes at Bevill College but did not

receive a degree. (Doc. 7-3, pp. 116-118). She stated that she was single, had two cats, and lived alone in her parents' house. (Doc. 7-3, pp. 116-117). Ms. Minor received some financial assistance from her sister. (Doc. 7-3, p. 117).

Ms. Minor testified that she had last worked in April 2021 as a sales associate at Wal-Mart. (Doc. 7-3, p. 188). She indicated that in 2020 or 2021, Wal-Mart wanted their employees to learn how to use the cash register, which caused Ms. Minor stress about her chronic diarrhea. (Doc. 7-3, p. 118). Ms. Minor testified that she "never had to do a shift[] running the register" and that she was "always a sales associate in a department." (Doc. 7-3, pp. 118-119). Ms. Minor stated that her gastrointestinal issues and explosive diarrhea were unpredictable and caused "a lot of anxiety" because she could not plan around those issues. (Doc. 7-3, p. 122).[15] She indicated that Dr. Johnson prescribed different medications for her gastrointestinal issues but none worked and some made her condition worse. (Doc. 7-3, p. 122).

To control her diabetes, Ms. Minor stated that she injected insulin twice a day, took metformin, and monitored her blood sugar with finger pricks. (Doc. 7-3, pp.

---

[15] When the ALJ asked Ms. Minor why using a cash register caused her stress, Ms. Minor responded: "Yes, because of the – I was swelling up and having, oh, diarrhea and the amount of force --." (Doc. 7-3, p. 118). The ALJ interrupted Ms. Minor and stated: "We're going to . . . talk about that in a second, but did you – were you ever a cashier at Wal[-M]art?" (Doc. 7-3, p. 118). Although Ms. Minor briefly indicated that her gastrointestinal issues caused anxiety, (Doc. 7-3, p. 122), neither the ALJ nor Ms. Minor's attorney asked Ms. Minor to explain why her fecal incontinence and chronic diarrhea caused anxiety and depression and affected her ability to work.

119-120).  She indicated that Dr. Sims told her she had a detached retina in her left eye for which she needed surgery, but the surgery was not scheduled because she had a hard time getting information from Dr. Sims's office.  (Doc. 7-3, p. 120).

Ms. Minor testified that because of knee pain, she could stand 20 to 30 minutes before she had to sit and could walk about 15 minutes before she needed to rest; she had to lay down six to eight hours during the day because of fatigue.  (Doc. 7-3, p. 121).  Ms. Minor stated that she weighed 250 pounds, that her weight fluctuated, and that she exercised by walking around her house.  (Doc. 7-3, pp. 116, 123).

Dr. Michael McClanahan testified as a vocational expert at Ms. Minor's administrative hearing.  (Doc. 7-3, pp. 123-126).  Dr. McClanahan classified Ms. Minor's past work as a sales clerk as semiskilled, light work but performed at the medium exertional level.  (Doc. 7-3, p. 124).  The ALJ asked Dr. McClanahan to assume a hypothetical individual with the same age, education, and work experience as Ms. Minor who could perform light work with the following limitations:

> [The individual could not] climb ladders, ropes, and scaffolds . . . [could] occasionally be exposed to extreme cold, extreme heat, [and could not] be exposed to workplace hazards such as moving mechanical parts and high exposed places.  [The individual's] vision [was] such that [she could] avoid ordinary hazards in the workplaces like boxes on the floor, doors ajar and so forth.  [The individual was] limited to jobs that require[d] only occasional near acuity . . . And this work must allow five percent off task in addition to normal breaks.
>
> .

(Doc. 7-3, pp. 124-125). Dr. McClanahan testified that the individual could perform Ms. Minor's past work as a sales clerk but not at the level Ms. Minor previously had performed it. (Doc. 7-3, p. 125).

In the ALJ's second hypothetical, he asked Dr. McClanahan to assume the same limitations as the first hypothetical except the individual could not perform job duties that required depth perception like threading a needle or that required peripheral vision in the left eye. (Doc. 7-3, p. 125). Dr. McClanahan testified that the individual could perform Ms. Minor's past work as a sales clerk but not at the level Ms. Minor previously had performed it. (Doc. 7-3, p. 125).

Dr. McClanahan testified that an employer would tolerate no more than two absences per month on a recurring basis or during the first 30 to 60 days of employment. (Doc. 7-3, p. 125). Dr. McClanahan indicated that employers would tolerate no more than five to ten percent off-task behavior in addition to a 30-minute lunch break and two 15-minute breaks in the morning and afternoon. (Doc. 7-3, p. 125).

## ALJ DECISION

On May 31, 2023, the ALJ issued an unfavorable decision. (Doc. 7-3, pp. 11-23). The ALJ found that Ms. Minor had not engaged in substantial gainful activity from her alleged onset date of April 11, 2021 through her date last insured. (Doc. 7-

3, p. 13).[16]    The ALJ determined that Ms. Minor suffered from the severe impairments of obesity, diabetes mellitus with autonomic neuropathy and gastroparesis, cataracts, and a detached retina in the left eye. (Doc. 7-3, p. 14). The ALJ found that Ms. Minor's hypertension, degenerative joint disease of the right knee, sleep-related breathing disorder, anxiety, and depression were non-severe impairments. (Doc. 7-3, pp. 16-17).

To support his decision that Ms. Minor's anxiety and depression were non-severe, the ALJ evaluated Ms. Minor's limitations using the "paragraph B criteria." (Doc. 7-3, pp. 16-18). The ALJ found that Ms. Minor demonstrated no more than mild limitation in the functional areas and that the evidence did not indicate more than a minimal limitation in her ability to do basic work activities. (Doc. 7-3, p. 18).

Based on a review of the medical evidence, the ALJ concluded that Ms. Minor did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 18).

---

[16]  A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A). If a claimant becomes disabled after her insured status expires, the ALJ must deny the disability insurance benefits claim.

Considering Ms. Minor's impairments, the ALJ evaluated Ms. Minor's residual functional capacity. (Doc. 7-3, p. 18). The ALJ determined that Ms. Minor had the RFC to perform:

> light work . . . except she [could] never climb ladders, ropes or scaffolds[;] . . . [could] occasionally be expos[ed] to extreme cold or [] heat[;] [could] never be exposed to workplace hazards such as moving mechanical parts and high, exposed places[;] [could] avoid ordinary hazards in the workplace (e.g., boxes on the floor, doors ajar, etc.)[;] [was] limited to jobs that require[d] occasional near acuity[;] [could] perform jobs that [did] not require depth perception like threading a needle[;] [and could] perform jobs that [did] not require peripheral vision on the left side. Work must allow 5% off-task in addition to regular breaks.

(Doc. 7-3, p. 18).

Based on this RFC and relying on testimony from Dr. McClanahan, the ALJ concluded that Ms. Minor could perform her past relevant work as a sales clerk as generally performed at the light exertional level. (Doc. 7-3, p. 22). Accordingly, the ALJ determined that Ms. Minor was not disabled under the Social Security Act. (Doc. 7-3, pp. 22-23).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close

scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301 (2015), and *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec.*, 603 Fed. Appx. 783,

786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. That review is *de novo*. *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1269 (11th Cir. 2019); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Minor argues that in his pain standard analysis and RFC determination, the ALJ did not adequately consider her subjective statements about the limitations caused by her fecal incontinence and chronic diarrhea, including how her anxiety about her ability to reach a restroom impacted her ability to perform her past work as a sales clerk. (Doc. 13, pp. 13, 16-17). An ALJ considers a claimant's RFC at step four of the sequential analysis. A claimant's RFC is the "most [a claimant] can do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a)(1). In assessing a claimant's RFC, an ALJ must "consider the limiting effects of all . . . impairment(s), even those that are not severe." 20 C.F.R. §§ 404.1545(e),

416.945(e).  "The RFC assessment must be based on *all* relevant evidence in the case record" including medical history, reports of daily activities, medical source statements, and the effects of symptoms.  SSR 96-8p at *5 (italics in SSR 96-8p).  In assessing a claimant's RFC, an ALJ must consider the combined effect of the claimant's impairments; an ALJ cannot selectively or separately account for impairments in an RFC and overlook how the impairments collectively impact the claimant's residual functional capacity.  *Schink*, 935 F.3d at 1269 (stating that in determining a claimant's RFC, an ALJ must evaluate that "claimant's medical condition taken as a whole").

As part of the step four analysis in determining a claimant's RFC, an ALJ applies the Eleventh Circuit pain standard "when a disability claimant attempts to establish disability through h[er] own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019); *Tucker v. Saul*, No. 4:19-CV-00759-RDP, 2020 WL 3489427, at *4 (N.D. Ala. June 26, 2020) (the pain standard "applies during the ALJ's step four determination of the RFC").  When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can

reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r of Soc. Sec.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r of Soc. Sec.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r of Soc. Sec.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept the claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When a claimant relies on her testimony to establish a disabling impairment, an ALJ must follow Social Security Regulation 16-3p. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent

than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2017 WL 5180304, at *4.  Concerning the ALJ's burden to explain the

reasons for discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:
>
> (i)   [the claimant's] daily activities;
>
> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) [p]recipitating and aggravating factors;
>
> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

At step four, in applying the pain standard and assessing Ms. Minor's RFC, the ALJ stated that he "considered all symptoms and the extent to which those symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (Doc. 7-3, p. 18).[17]  The ALJ found that Ms. Minor's "medically determinable impairments could reasonably be expected to cause some of [Ms. Minor's] alleged symptoms" but concluded that the "intensity, persistence, and limiting effects of [Ms. Minor's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 7-3, p. 19.  (Doc. 13, p. 13).  Regarding Ms. Minor's gastrointestinal impairments, the ALJ found those impairments "reasonably could cause, or be expected to cause, additional trips to the

---

[17]  At step two of the sequential analysis, the ALJ wrote that he "considered all of [Ms. Minor's] medically determinable impairments, including those that are not severe, when assessing [her] residual functional capacity." (Doc. 7-3, p. 16).

restroom, or other necessary personal time away from assigned tasks." (Doc. 7-3, p. 20). The ALJ stated that Ms. Minor's gastrointestinal symptoms supported "some limitation" and added that he "accommodated this limitation be allowing limited additional personal time during the workday," namely 5% off-task time in addition to regular breaks. (Doc. 7-3, pp. 18, 20).

In applying the pain standard and determining the RFC at step four, the ALJ did not discuss Ms. Minor's medical records regarding her gastrointestinal issues or her anxiety and depression; instead, the ALJ discussed Ms. Minor's medical records about these impairments at step two when determining the severity of her impairments. (Doc. 7-3, pp. 14-16, 20-21). At step two, the ALJ noted Ms. Minor's complaints of "ongoing gastrointestinal symptoms related to diabetic neuropathy with gastropareses." (Doc. 7-3, p. 20). The ALJ mentioned Ms. Minor's March and April 2021 reports to Dr. Johnson regarding her chronic diarrhea and her anxiety about working the cash register at Wal-Mart "because of bowel urgency." (Dc. 7-3, p. 14). The ALJ acknowledged Dr. Johnson's letter to Wal-Mart regarding Ms. Minor's gastrointestinal issues and anxiety. (Doc. 7-3, p. 14). The ALJ noted Dr. Johnson's May and November 2021 records which recount Ms. Minor's complaints of abdominal cramps, explosive diarrhea, and fecal incontinence, and the ALJ acknowledged Ms. Minor's anxiety, worry, and embarrassment regarding this impairment. (Doc. 7-3, p. 14). The ALJ noted Mr. Minor's reports to Dr. Johnson

in April 2022 that she "still [had] the same problems with chronic diarrhea and [had] to stay close to the bathroom" and acknowledged Dr. Johnson's statements in his April 2022 and January 2023 notes that Ms. Minor's gastrointestinal impairments "impacted [Ms. Minor's] quality of life and daily function and essentially cost her job at Wal-Mart." (Doc. 7-3, pp. 15, 16). Based on these medical records, the ALJ found that Ms. Minor's "diabetes mellitus with autonomic neuropathy and gastroparesis" was a severe impairment. (Doc. 7-3, p. 14).

In finding Ms. Minor's anxiety and depression non-severe at step two, the ALJ considered the areas of mental functioning set out in the disability regulations and in the Listing of Impairments known as the "paragraph B criteria." 20 C.F.R. § 404.1520a; *see* (Doc. 7-3, pp. 16-18). The ALJ found that Ms. Minor had mild limitation in the functional area of concentrating, persisting, or maintaining pace and no limitation in the functional areas of understanding, remembering, or applying information; interacting with others; and adapting and managing oneself. (Doc. 7-3, p. 17). To support these findings, the ALJ noted Dr. Majure's November 2021 consultative mental examination findings and Ms. Minor's reports that she followed written instructions well, spent time with and got along with others, shopped in stores, got along with authority figures, drove, counted change, handled a savings account, maintained a checkbook, and could perform multiplication and word problems. (Doc. 7-3, p. 17). The ALJ noted that Ms. Minor had adequate insight,

lived alone, and could complete her activities of daily living independently.  (Doc.

7-3, pp. 17-18).  Because Ms. Minor's anxiety and depression caused no more than

mild limitation in the functional areas, the ALJ found that her anxiety and depression

was non-severe for purposes of the ALJ's disability analysis.  (Doc. 7-3, p. 18).[18]

Other than the five percent off-task limitation, the ALJ did not include in Ms.

Minor's RFC other limitations to accommodate her unpredictable and uncontrolled

diarrhea.  In assessing Ms. Minor's RFC at step four, the ALJ did not meaningfully

discuss Ms. Minor's anxiety and depression related to her fecal incontinence and

chronic diarrhea.  In his step four analysis, the ALJ mentioned that Ms. Minor took

Lexapro and Buspar for anxiety and depression and that she alleged in her function

report that she had anxiety and depression.  (Doc. 7-3, p. 19).  The ALJ's brief

mention of Ms. Minor's mental impairments at step four is not sufficient for the

Court to determine if the ALJ adequately considered how Ms. Minor's

gastrointestinal issues impacted her anxiety and depression.  *Schink v. Comm'r of*

*Soc. Sec.*, 935 F.3d 1245, 1269 (11th Cir. 2019) ("And while [step four] mentions

---

[18]  At the end of his step two analysis, the ALJ stated:  "The limitations identified in the 'paragraph B' criteria [were] not a residual functional capacity assessment but [were] used to rate the severity of mental impairments at step 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process require[d] a more detailed assessment.  The following residual functional capacity assessment reflects the degree of limitation [he had] found in the 'paragraph B' mental function analysis."  (Doc. 7-3, p. 18).

that Schink had bipolar disorder, the decision [in step four] contains no real discussion of how the mental condition affected Schink's RFC.").[19]

As Ms. Minor noted in her brief, the five percent off-task limitation in her RFC misses the mark: 5% of an 8-hour workday is 24 minutes of off-task time during a workday. Ms. Minor's medical records do not indicate that her gastrointestinal issues were such that she could manage them with short bathroom breaks three or four times during a workday. Instead, her medical records demonstrate that on one occasion at Wal-Mart, she soiled her clothes because she could not make it to the bathroom quickly enough, and she had to buy new clothes during her shift. (Doc. 7-5, pp. 111-112). The ALJ did not mention Ms. Minor's report to Dr. Johnson in April 2022, when Ms. Minor was not working, that she had to stay close to a bathroom and often wore pull ups and soiled herself because of her fecal incontinence. (Doc. 7-6, p. 254). The ALJ did not mention Dr. Johnson's report that Ms. Minor's chronic diarrhea impacted her quality of life and her daily function and kept her "from working any public job." (Doc. 7-6, p. 282). The ALJ did not mention Ms. Minor's statements in her April 2021 and August 2022 function reports that she did not go anywhere on a regular basis after the April 2021 incident

---

[19] At step four, the ALJ found "mostly persuasive Dr. Majure's opinion that Ms. Minor was "unimpaired in her ability to understand, remember, and carry out instructions and respond appropriately to supervision, co-workers, and work pressures in a work setting." (Doc. 7-3, p. 22). Neither the ALJ in making this finding nor Dr. Majure in her mental assessment mentioned or discussed Ms. Minor's consistent reports regarding her anxiety and depression related to her urge fecal incontinence and chronic diarrhea.

at work and rarely left her house because of her "anxiety over fear of not getting to a bathroom in time." (Doc. 7-4, pp. 110, 144-145, 150).

The Commissioner argues that Ms. Minor's description of the debilitating effects of her fecal incontinence lacks evidentiary support because, for example, Dr. Johnson recommended that Ms. Minor "take a brisk walk for 30 minutes each day." (Doc. 16, p. 5). In fact, to address Ms. Minor's obesity, Dr. Johnson regularly urged her to walk "to 30 minutes daily," presumably meaning "up to 30 minutes daily." (*See*, *e.g.*, Doc. 7-5, p. 100). But Dr. Johnson also wrote in April 2022 that Ms. Minor could not exercise because she had to stay close to a bathroom. (Doc. 7-6, p. 254). Dr. Johnson clearly understood that though walks were in Ms. Minor's best interest to address her weight, she could not follow his recommendation because of fecal incontinence. In other words, Ms. Minor's need to take brisk walks to address one health concern, her obesity, was complicated by her need to stay close to a bathroom because of her incontinence. By the same token, the 5% off-task limitation in Ms. Minor's RFC does not adequately address her incontinence and the unpredictable nature of her diarrhea or the anxiety that the gastrointestinal impairment caused Ms. Minor when she was in public.

In *Schink*, the Eleventh Circuit explained:

At step four of the sequential analysis, the ALJ conducts a residual-functional capacity assessment of the claimant, which is "an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments." *Lewis*, 125

F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).  The ALJ makes this determination by considering a claimant's physical, mental, and other abilities affected by the impairment.  *See* 20 C.F.R. § 404.1545(b)-(d).  . . .

To support his conclusion that Schink was able to return to his past job as a car salesman, the ALJ was required to consider all the duties of that work and evaluate Schink's ability to perform them despite his impairments.  *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990).  Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC.  *Bowen v. Heckler*, 748 F.2d 629, 634-35 (11th Cir. 1984).  The ALJ must also consider a claimant's medical condition taken as a whole.  *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Phillips*, 357 F.3d at 1237 (ALJ has a duty to consider impairments in combination and to determine whether combined impairments render the claimant disabled); *see also* 20 C.F.R. § 404.1523(c) and Social Security Ruling 96-8p.  If an ALJ fails to address the degree of impairment caused by the combination of physical and mental medical problems, the decision that the claimant is not disabled cannot be upheld.  *Bowen*, 748 F.2d at 634 ("[I]t is certain that mental and psychological defects can combine with physical impairments to create total disability to perform gainful employment." (quoting *Brenem v. Harris,* 621 F.2d 688, 690 (5th Cir.1980))).

*Schink*, 935 F.3d at 1268-69.

In this case, to support his conclusion that Ms. Minor could return to her job as a sales clerk, the ALJ had to determine whether a 59-year-old claimant with degenerative joint disease in her right knee, vision issues, diabetes, fecal incontinence, explosive diarrhea, and anxiety and depression managed through medication and isolation could interact with co-workers and the public or withstand work pressures to perform her past work as a sales clerk.  The ALJ had to completely

discount Dr. Johnson's report that Ms. Minor could not work in public. From the record before it, the Court cannot conclude that the ALJ conducted the analysis required at step four to formulate Ms. Minor's RFC. Therefore, the Court remands this case for additional proceedings.

## CONCLUSION

For the reasons discussed above, the Court remands this case for additional proceedings consistent with this opinion.

**DONE** and **ORDERED** this March 17, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE